William R. Brennan, Jr., J.
The plaintiffs were the owners of a luncheonette. By writing dated July 8, 1957, they entered into an exclusive brokerage agreement with the defendant Barth, a business broker, fixing a proposed sales price of $27,500 for the business and a commission of 5% of selling price. The exclusive arrangement was effective until August 10, 1957. No purchaser was produced thereunder.
Thereafter, and prior to March 22, 1958, the defendants (the defendant Wasserman was a salesman employed by defendant Barth) produced a purchaser for the business, one Greenspan, for an agreed price of $38,500, the sellers having raised their price in the period following August 10,1957. They entered into a written agreement with Greenspan dated March 22, 1958, reflecting the agreed price and providing for its payment as follows : $1,500 upon execution of the agreement by check subject to collection, the proceeds to be held in escrow by the sellers’ attorney pending closing, $8,500 in cash or certified check at closing; $7,848 by taking title subject to and assuming an existing mortgage; and the balance by giving notes secured by a purchase-money second chattel mortgage. The agreement made no reference to the source of the $10,000 in cash that purchaser would be required to produce for the transaction; nor did it *448 make any reference to the purchaser’s financial condition or solvency except to provide that if the purchaser assigned the contract to a corporation he was to personally indorse its notes and deposit the stock of the corporation as further security. The writing expressly merges previous understandings and disclaims reliance upon any statements or representations other than those embodied in the writing.
Although by written addition to the contract of sale the parties thereto agreed that ‘ ‘ David Barth is the sole broker who brought about this transaction and seller agrees to pay 5% commission if and when this transaction closes ”, there is no question that the codefendant was a salesman in Barth’s employ.
The transaction closed on March 26,1958 when all instruments were delivered and Bradshell Luncheonette, Inc., corporate assignee of the purchaser, completed payment of the $10,000 in cash subject to contract adjustments.
Thereafter the corporate buyer defaulted and plaintiffs assert that they then learned for the first time that $5,000 of the cash part of the price paid at closing by the corporation represented the proceeds of a loan made to the corporation by the defendant Wasserman and one Martin Orleck and that to secure repayment thereof the corporation had on March 26, 1958, the closing date, delivered to Wasserman and Orleck a chattel mortgage junior in lien to the assumed first mortgage and the purchase-money chattel mortgage, under the terms of which $7,000 was required to be paid these lenders.
The complaint originally served contained five causes of action. By stipulation all causes but the second have been withdrawn. The second cause of action seeks the recovery of the commission of $1,925 (5% of the purchase price of $38,500) paid to the defendants at the time of closing on the theory that having failed to disclose to the plaintiffs their part in financing the purchase by lending money to the corporate purchaser and by taking back a lien junior to the plaintiffs’ on the corporation’s assets, the defendants violated their obligations as brokers in the transaction.
The plaintiffs say they had no knowledge of the secondary financing until some time after the default above referred to. The defendant Barth claims he advised the plaintiffs prior to closing that the purchaser could not raise more than $5,000 in cash and would have to borrow $5,000, although he did not tell them who was lending the money. He is supported by the testimony of Greenspan who signed the contract of sale and who says he told the plaintiffs that he was borrowing and giving a third mortgage to secure repayment of the borrowed money. *449 The court finds that prior to closing the plaintiffs knew that the purchaser was making arrangements to borrow a substantial part of the cash required for closing. It is also found that at the closing one of the checks tendered and accepted in part payment of the cash requirement was a check for $3,000 made by Franklin National Bank to the defendants and by them indorsed over to the plaintiffs with the approval of Bradshell Luncheonette, Inc., noted thereon. The check represented the proceeds of an advance made to the defendants by the bank as a loan to them.
The plaintiffs are businessmen and were represented by able counsel. The form of the check taken in conjunction with the earlier notice they had that the purchaser needed financing to make the cash payment required by the contract was notice that the defendants were involved in the financing. If the funds had come from any other source it would not have been necessary for the defendants to borrow from Franklin National Bank and a third party’s check or a special account check would have been the customary mode of payment. Furthermore, it is obvious that if the defendants were trying to conceal their loan it is hardly likely that they would have made available to the purchaser at closing a check to their own order.
The plaintiffs thus had knowledge at the time of closing of the loan by defendants to the purchaser. There is neither claim nor proof that the defendants violated their obligations as brokers to procure a purchaser at the plaintiffs’ price or upon their terms; or that the defendants received compensation as brokers from both sides; or that the defendants had any interest in the corporate purchaser or received any preference from it. On the contrary, they negotiated the price and terms the plaintiffs fixed and in making the loan required to close the deal took a position completely subordinate to the plaintiffs. Moreover, there is no evidence that the plaintiffs were at all concerned with or about the source of the cash payments made to them. Their concern, and properly so, was with adequate security for the deferred payments. This security they received. The deal closed, the commissions were paid. That all parties have sustained losses by the subsequent default of the buyer does not render unearned the commission theretofore concededly earned and paid.
The Clerk is therefore directed to enter judgment dismissing the second cause of action.